Granger, C. J.
The first section- of its, charter granted to the insurance company power to. possess and invest effects of every kind, and to su.e. and be sued in all courts of justice. This grant of power clothed the company with capacity to make the loan and take the mortgage and note from Roberts. Did section twelve take away, this capacity? The object of that section is plain. The safety of policy holders required safe investments by the company. This section was intended primarily-for the protection of policy holders and stockholders. No word in it. directly concerned either governmental policy, or community, or third parties; but, as .a whole,, it prevented the pompany from doing a banking business. ,Well-settled;rules require that the courts shall construe its provisions, so as to promote the legislative intent, if this can reasonably be done. The plaintiff in error, insists that because the officers of the company did not literally obey the- legislative direction, and take a bond instead of a. note, therefore the company cannot enforce any lien under the mortgage. This construction would souse a. section intended to secure policy holders and stockholders from loss, by reason of bad investments made by the officers of the company, as to make sure a loss of the .entire principal invested, because of an error in the form of the evidence.of invest *11 ment taken by those officers. . Counsel support this claim by Ohio cases from Bank of Chillicothe v. Swayne, 8 Ohio, 280, to Kilbreth v. Bates, 38 Ohio St., 187. Ohio policy as to banks and their powers and privileges. is. clearly stated and enforced in these cases.- Peculiar dangers to the community were supposed to lurk in such corporations. But we can find no evidence of like fears touching insurance, companies that make no attempt to.-exercise banking powers. Legislation has labored to secure, .policy holders and stockholders from losses by the frauds and misconduct of company officers and agents-. It seems,to .us that this current of Ohio authority furnishes no reason for not applying to section twelve of this Connecticut charter the rule,of construction before stated; to wit, that which.will give effect to the legislative intent. -
We think that, by taking the note and mortgage, the company substantially complied with ..the charter.- The investment had nothing of the nature of a banking-transaction. Although the. note.was not under seal, it was so worded that, prima facie, it. imported a , consideration. Under Ohio practice and pleading, precisely the same form of petition, or cross-petition, enforces fore closure, or asks for a personal judgment on. the note, as would be used if a bond had been taken.
Since Judge Hitchcock decided The Bank of Chillicothe v. Swayne, a radical change has. occurred in the relation of corporations to the State and to the people. -Then, and theretofore, special charters granted to-persons.-named, -and to such others as they associated with themselves; gave special powers and rights, that, as a rule, were beyond legislative control: only in the rare cases .where the power to amend, alter, or repeal was expressly reserved,- could the legislature modify, limit, or take away power-once granted. In those days a- corporation was a monopoly. It was necessary to strictly construe the grants made, in order-to protect the interests of the State and of people generally. But now the legislature has far more power over .corpora *12 tions than over individuals. It may alter, or repeal, all acts granting corporate power, it may impose new conditions of its exercise. It can mould the statutes as experience or legislative caprice may dictate. There is no longer reason to hesitate to apply to the language of acts of incorporation precisely the same rules of interpretation as are applied to like words in any contract or statute. -
This charter was granted in Connecticut. Counsel for the bank cite N. Y. Fire Ins. Co. v. Ely, 5 Conn., 573. In that case the third, or granting, section authorized “ loans on bottomry, respondentia, or mortgage of real estate.” The act there in question was a simple discount of a note. Moreover the sixteenth section of that charter expressly prohibited such transactions by the company. But years afterwards, in 26 Conn., 157, in Vansands v. Middlesex County Bank, the Supreme Court of Connecticut, applying a statute that declared “ no bank shall make any loan or discount on pledge of its own stock,” say “ the directors of banks whose exclusive business it is to make loans and discounts, and perhaps the banks of which they are the agents, might be amenable to the courts for a violation of this law, if they should disregard its prohibition, as they clearly would be to the legislature; but there would seem to be no sufficient reason why the loan or pledge should be declared void. Especially is it questionable whether it can be • treated as invalid, in the absence of any provision in the act declaring that the loan or pledge shall be void, or imposing any punishment .for its violation. There is therefore much reason for the claim that the act is only directory.”
Although the court did not in that case directly decide whether the words then under consideration were merely “ directory,” the opinion plainly indicates that such a provision as the one now before us would not be so construed in Connecticut as to make void either mortgage or note.
Counsel upon both sides have industriously collated the authorities.- It is apparent that the modern cases do not *13 follow the harsh strictness of the earlier decisions. In different States different distinctions are drawn: the grounds of departure from the old rule are variously stated. For myself, I am content to say that the maxim, “ Where the reason of the law ” (the common law, — and our rules of construction are common-law rules) “fails, the law fails,” is a sufficient ground. The corporation of to-day in Ohio is so different from the corporation of Judge Hitchcock’s day, that it would not be exaggeration to say that the two are wholly unlike; that is, in their relations to the legislative power.
We think, then, that neither under the law*of Connecticut, nor under that of Ohio, is the note and .mortgage of the insurance company invalid because of the terms of the charter.
Proceeding to the second objection, we find no provision in the charter limiting the rate of interest to be stipulated for, or received by, the company. The general usury law of Ohio applies alike to such artificial persons and to natural persons. The note is not void. Only legal interest can be collected upon it. It is unnecessary to cite cases on this point.
The third claim is based upon section two (2) of the Act entitled, “An act amendatory of and supplementary to an act entitled, ‘An act to regulate insurance companies doing an insurance business in the State of Ohio’” (70 O. L., 153), as amended by the act of February 20, 1874 (71 O. L., 12). It reads thus:
“ Section 2. No company or corporation organized under the laws of any other State, or of the United States, or of any foreign government, doing a banking or any other kind of business in connection with insurance, shall do business in this State.”
A note running for five years, drawing interest payable semi-annually, and secured by mortgage on real estate, made and given for a loan of money made by mortgagee to mortgagor, is not such a note as belongs to “ banking *14 business.”'- Owing to' circumstances a banking house sometimes may make such a loan, but when it does so it engages in a transaction outside of “banking business.” This is too well known to require further remark.
In making such 'a loan, did the company “ do any other kind of business ” within the purview of said section?
It is a necessary part of'insurance business to make payment of policies, when the money thereon becomes due. Would the'care of-that money be “doihg any other kind of business ”? '■ Would the deposit of that money in some bank, upon certificates of deposit drawing interest, be such “other business”? Is the placing of that money in the hands of the policy holder in his lifetime, upon his secured promise to pay interest thereon, “ such business ” ?
Is not the care of the money required to pay policies a necessary part of the insurance business itself? Is not the lawful investment of that money* so'that its interest will pay taxes and commissions, and strengthen the company, et part of the insurance business itself?
The act: containing' said section- 2' (see 69 O. L., 141), recognizes this fact. ■' The first section authorizes the company “ to carry on the business of insurance.” Under that simple general power, the legislature supposed that the company could make investments' of its capital. The act nowhere 'expressly "grants power to invest. Section 6 recognizes the power as impliedly granted by section 1, and proceeds to limit it by making it “unlawful to invest” otherwise than said section 6 provides. This section is very similar to section 12 'of the Connecticut Charter. Is not this a legislative construction ? . “ To carry on insurance business ” implies the power to make investment of the moneys required to pay policies.
Moreover, section 18, of'the same act (69 O. L., p. 156) requires each'foreign company to'have at least $100,000 of its capital invested in bonds and mortgages on unincumbered real estate in this State, or in other, specified securities. If the making of loans and the taking of mortgages *15 be “any other kind of. business .in- connection with ‘insurance,’ ” section 2 seriously conflicts with section 18. We think this objection also unfounded.
■ Under objections two and three, or under one of them, the bank urges that the rule of the company under which loans are made to policy holders only, invalidates this note or mortgage-. We are unable to understand why this should be so. Such a rule tends to increase the legitimate business of the company, and also to secure the loan itself. We think the judgment of the district court giving prior payment to the insurance' company was right.

Judgment affirmed.

Martin, J'., did not sit iii this case.